1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARY QUACKENBUSH, GHERI
SUELEN, ANNE PELLETTIERI,
MARISSA FEENEY, and CARYN
PRASSE, on behalf of themselves and all
others similarly situated,

    Plaintiffs,

  v.

AMERICAN HONDA MOTOR
COMPANY, INC., et al.,

    Defendants.

No.  C 20-05599 WHA

**ORDER RE MOTIONS FOR CLASS
CERTIFICATION AND TO
EXCLUDE PLAINTIFFS' EXPERT**

**INTRODUCTION**

  In this automobile products-liability class action, named plaintiffs seek to certify a class of

vehicle purchasers, appoint three class representatives, and appoint class counsel.  One

defendant opposes and moves to exclude plaintiffs' expert.  To the extent stated, a class will be

**CERTIFIED**.  The *Daubert* motion is **DENIED**.

**STATEMENT**

  The undisputed facts follow.  In 2008, prior to our putative class period, certain vehicles

produced by defendant American Honda Motor Company, Inc. began to rattle on start up.

Honda launched an investigation.  Honda eventually fingered the VTC Actuator 14310-R44-

A01 (R44).

United States District Court
Northern District of California

Actuators consist of a rotor that moves an engine's tension chain, not unlike a sprocket moving a chain on a bicycle. The tension chain in turn moves the camshaft, which opens and closes valves to allow air and fuel to enter the engine. The tension chain is not the only chain powering an engine. In the relevant vehicles, rotation of the "serpentine belt" moves other peripheral device such as alternators, air pumps, and water pumps.

Actuators like the R44 aim to maximize fuel efficiency by optimizing the timing of the camshaft. Unlike bicycles, an oil hydraulic system powers the R44. The R44 fills with oil when the engine is on and oil pressure controls the motion of the rotor. The R44 rotor consists of interlocking parts, the housing and the vane (Gibson Decl. ¶ 4):



When an engine is off, oil drains from the assembly. A "spring-backed locking stopper pin" prevents the vane from rotating when oil is not present. After ignition, oil pressure rebuilds and the pin disengages, with oil allowing the vane to move smoothly. A side-view:



Beginning with certain 2008 models equipped with the R44, Honda began receiving complaints of a rattle on vehicle ignition. Investigation revealed that the pin in some R44s prematurely disengages from its seat in the bush, permitting the vane to bang violently within the housing, and produce a rattle. The "premature disengagement" that allows the vane to move freely only causes the rattle for a few seconds, because adequate oil pressure builds up

2

and cushions the assembly (Gibson Decl. ¶¶ 1–10; Stapleford Rebuttal Rep. ¶ 15; Arst Dep. 13).

Honda investigated the issue for eight years (2008–16) and implemented six countermeasures. The final countermeasure replaced the R44 with a new part (the R5A). Each countermeasure sought to address why the pin disengaged early by, writ large, modifying the spring force, the pin's fit in the bush, or the pin shape. Each R44 remained interchangeable with another, regardless of countermeasure. The countermeasures, by date and brief description follow, with the sixth phasing out the R44 and introducing the R5A (Arst Dep. 12, 60–61; Stapleford Rep. ¶ 9):

1.   12/03/07 — U-Groove width sorting at Denso.

2.   9/11/08 — Select Fit to achieve target Stopper Pin Depth.

3.   9/10/09 — DC – Revise Pin Depth Spec from 2.02mm-5.20mm to 3.3mm-4.97mm.

4.   8/8/12 — DC – Specify Pin Depth target on DWG – target Mid Spec (Y:6.87mm).

5.   4/24/13 — Decrease Spring Load from 5.78 to 3.64N. Pin Nose Taper changed from 15° to 13°.

6.   9/24/2015 — Design Change A1508259 issued for 14310-R5A-305.

Believing it had solved the problem, Honda briefly closed its investigation after the first three countermeasures but in March 2011 began investigating a "limited number of claims for cam chain tensioner plunger teeth wear in the 2008 and 2009 Accord." Honda believed the rattle could be linked to the R44. While the 2011 investigation remained ongoing, in January 2014, Honda themed up another investigation to examine similar complaints in 2013 and 2014 CR-Vs (Gibson Decl. ¶ 18).

Only vehicles sold with the R44 beginning in model year 2012 feature in this suit. From 2012 until the redesign in 2016, only certain makes and models and years received the R44. Some R44s received one or more of the countermeasures but only in certain combinations.

This table shows the class vehicles by the applicable combinations of model, year, and countermeasure (*ibid*. ¶¶ 17, 26).

|  | C/M #1 | C/M #2 | C/M #3 | C/M #4 | C/M #5 |
|---|---|---|---|---|---|
| 2012 Accords | ✓ | ✓ | ✓ |  |  |
| 2012 Crosstours | ✓ | ✓ | ✓ |  |  |
| 2012 CR-Vs | ✓ | ✓ | ✓ |  |  |
| Some late-manufactured 2012 Accords |  |  |  | ✓ |  |
| Some 2013 Crosstours |  |  |  | ✓ |  |
| Some 2013 CR-Vs |  |  |  | ✓ |  |
| Some 2013 Crosstours |  |  |  | ✓ | ✓ |
| Some 2013 CR-Vs |  |  |  | ✓ | ✓ |
| 2014 CR-Vs |  |  |  | ✓ | ✓ |
| 2014–2015 Crosstours |  |  |  | ✓ | ✓ |

In short, some vehicles received countermeasures numbers one, two, and three; some received countermeasure number four, and some received countermeasure numbers four and five.

No later than the summer of 2012, Honda concluded that the early disengagement was caused by an R44 design that, *first,* allowed for excessive wear and tear of the pin; and/or "*second*," as of 2014, allowed an "air pressure spike" that pushed the pin out of place (Gibson Decl. ¶¶ 25–28).

Although Honda engineers proposed a warranty extension on the R44 when the R5A debuted in March 2016, Honda ultimately concluded that neither the rattle's frequency nor its any apparent hazardousness justified the extension and it never came to be (Arst Decl. ¶¶ 31–32).

In 2012, named plaintiff Mary Quackenbush purchased a new 2012 Honda CR-V from an authorized California dealer. A rattle on start-up (and no other symptoms) began in 2020, and she paid for a repair of her R44 from a Honda dealer at 95,896 miles. Anne Pellettieri

purchased a new 2014 Honda CR-V from a California authorized dealer in 2014, first heard a
rattle one to two years after purchase, and noticed it worsen three to five years after purchase.
She did not seek a repair.  She received replacement parts, including a new actuator and
serpentine belt, as part of this suit.  Afterwards, the rattle disappeared.  Marissa Feeney went to
an Illinois authorized dealer in 2019.  Feeney and her mother are listed as purchasers of
Feeney's used 2014 CR-V, purchased with 93,974 miles.  Her mother paid.  Feeney noticed a
rattle within a few months of owning the car (plus "hesitation," "delay," and "sluggishness" on
acceleration), and paid for a replacement actuator.  She continued to hear the noise periodically
after the repair (Quackenbush Dep. 28–94; Delgado Decl. Exh. 14; Pellettieri Dep. 28–140;
Delgado Decl. Exh. 13; Feeney Dep. 48–120).

Plaintiffs claim violations of the following:  the California Consumers Legal Remedies
Act (CLRA), California Civil Code § 1750, *et seq.*; California Business & Professions Code §
17200; Breach of Implied Warranty Pursuant to California Song-Beverly Consumer Warranty
Act, California Civil Code §§ 1792 and 1791.1, *et seq.*; breach of implied warranty under
California Community Code § 2314; Illinois Consumer Fraud and Deceptive Business
Practices Act, 815 ILCS 505/1 *et seq.*; Breach of Implied Warranty, 810 Ill. Comp. Stat. § 5/2-
314; *and* fraudulent omission.  Counts Six and Seven of the First Amended Complaint allege
violations of Virginia law, but plaintiffs do not seek to certify a Virginia class.  This order
follows full briefing and oral argument.

**ANALYSIS**

Plaintiffs allege that Honda's failure to disclose the defect in the R44 injured them and
that the defect posed a safety hazard in all class vehicles.  As stated, the R44 appeared only in
2012 Honda Accords with an L4 engine, 2012–2014 Honda CR-Vs with a 2.4-liter engine, and
2012–15 Honda Crosstours with an L4 engine (class vehicles) (Greenstone Decl. ¶¶ 9, 10;
Exhs. B., C).

The following classes shall be certified:

> **California New and Used Purchaser Class:**  Current owners of
> both new and used class vehicles who purchased their class vehicles

equipped with VTC Actuator 14310-R44-A01 from an authorized
Honda dealer in California and former owners of the same who
resold (or traded it in) to an authorized Honda dealer in California.
Anne Pellettieri will represent the class.

**California Repair Class:**  All persons who purchased a new or used
Class Vehicle equipped with VTC Actuator 14310-R44-A01 from a
Honda dealer in California, and who paid to have their VTC
Actuator repaired by an authorized Honda dealer in California.
Mary Quackenbush will represent the class.

**Illinois Repair Class:**  All persons who purchased a new or used
Class Vehicle equipped with VTC Actuator 14310-R44-A01 from a
Honda dealer in Illinois, and who paid to have their VTC Actuator
repaired by an authorized Honda dealer in Illinois.  Marissa Feeney
will represent the class.

These are modified from the proposed classes, for reasons explained below.  Lacking a
representative class member who purchased a Honda from an authorized dealer in Illinois and
did not pay for a replacement, that proposed class will not be certified.  Given the vehicles that
came equipped with the R44, our class period includes those who purchased new or used
Honda Crosstours, Accords, and CR-Vs listed in the table above, from Honda authorized
dealers between 2012 and the present.

To certify a class, plaintiffs must show that the proposed class action satisfies all
requirements of Rule 23(a).  Since plaintiffs seek money damages, Rule 23(b)(3) requires that
questions of law or fact common to class members predominate over any questions affecting
only individual members, and that a class action prove superior to other available methods for
fairly and efficiently adjudicating the controversy.  Alternatively, plaintiffs seek an injunctive-
relief class under Rule 23(b)(2).

1.    NUMEROSITY AND ASCERTAINABILITY.

Honda contests neither factor.  The class is ascertainable through Honda records.  The
number of purchasers who received the R44 VTC actuators number 221,903 (plaintiffs'
contention) or 140,481 (Honda's) in California, and either 43,657 or 75,435 in Illinois.  By
either estimation, "joinder of all members is impracticable."  FRCP 23(a)(1).

6

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.   **COMMONALITY AND PREDOMINANCE.**

A.   *CLASS-WIDE DESIGN DEFECT (ALL CLAIMS).*

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). In automobile design-defect suits, commonality and predominance analyses appear coextensive. *See Edwards v. Ford Motor Co.*, 603 F. App'x 538, 540 (9th Cir. 2015). Common answers regarding a design defect will predominate and appear "apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 359 (2011) (cleaned up).

Preliminarily, Honda argues that the "downstream engine failure" comprises the putative defect, because a rattle cannot pose a safety hazard (Opp. Br. n. 4). *Wolin v. Jaguar Land Rover North America, LLC*, forecloses Honda's argument: "[P]roof of the manifestation of a defect is not a prerequisite to class certification." 617 F.3d 1168, 1173 (9th Cir. 2010). Thus, allegations of a tire defect at "purchase" states a claim, "regardless of when and if the defect manifested." *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 819–20 (9th Cir. 2019). Under *TransUnion LLC v. Ramirez*, all putative class representatives have therefore alleged injury: that Honda over-charged them for defective R44s. 594 U.S. __ , 141 S. Ct. 2190, 2208 (2021).

Plaintiffs must, however, show a common design (defect) class-wide. *Wolin* found a common defect despite some differences in tire-alignment-specification adjustments. 617 F.3d at 1173. But *Wolin* involved just one make and model. Nonetheless, in general, neither intra-class-period changes to a single relevant part nor different makes and models necessarily alter the design of a single automobile component. For instance, a common design of the electronic throttle control system appeared despite differing "calibration," two changes to the "throttle position sensor," and one redesign of the throttle body component. Defendant's Memorandum in Opposition to Plaintiffs' Motion for Class Certification, *Edwards, et. al.*, 603 F. App'x at 540, 2012 WL 2116243, Section C. 2. In *Philips v. Ford Motor Co.*, differing placement of the same defective electromechanical relays bore only "minor relevance" to the design defect and

7

1    did not defeat predominance. 2016 WL 7428810, at *1 (N.D. Cal. Dec. 22, 2016), *aff'd,* 726

2    F. App'x 608 (9th Cir. 2018) (Judge Lucy H. Koh).

3        On the other hand, when class vehicles involve unique parts (*In re Hitachi Television*

4    *Optical Block Cases*, 2011 WL 4499036, at *3–*4 (S.D. Cal. Sept. 27, 2011) (Judge Dana M.

5    Sabraw)), different materials (*Grodzitsky v. Am. Honda Motor Co. Inc.*, 2014 WL 718431, at

6    *5 (C.D. Cal. Feb. 19, 2014) (Judge Stephen V. Wilson)), or otherwise materially affect the

7    evidence needed to prove a design defect, no common design defect appeared. Exemplifying

8    the last point, *Stockinger v. Toyota Motor Sales, U.S.A., Inc.*, found no common design when

9    the class engine bore "different air inlet design, orientation, and size"; location and number of

10   HVAC systems; and various cabin filters, which altered "airflow and evaporation," the root

11   cause of the alleged malodorous defect. 2020 WL 1289549 at *7 (C.D. Cal. Mar. 3, 2020)

12   (Judge Virginia A. Phillips).

13       This order holds that none of Honda's countermeasures, or combinations thereof,

14   materially changed the R44 design. The *first* countermeasure involved sorting the "U-Groove"

15   in which the pin sat in the bushing to "tighten[] the range of initial interference," *i.e.* make the

16   pin fit more snugly in the bushing. The *second* countermeasure "select[ed] components that

17   resulted in an increased initial interference fit of the lock pin." The *third* limited spring force

18   to the higher end of the specification, "increasing the initial holding force." Two more

19   countermeasures occurred in the class period: the *fourth*, in August 2012, increased

20   interference to prevent friction on the pin while it was disengaged. This aimed to prevent the

21   "wear and tear" believed to lead to premature disengagement. The *fifth*, in April 2013,

22   increased the spring load from 5.78N to 3.64N, also to prevent wear based on the pin bushing

23   at idle, and changed the angle of the pin nose taper from 15 to 13 degrees to reduce wear by the

24   bushing onto the pin (Gibson Decl. ¶¶ 13, 15, 16, 26, 29).

25       Honda has failed to surmount plaintiffs' showing that, throughout the class period, the

26   design remained "fundamentally the same" in all material ways. Honda's own witnesses

27   consistently diagnosed that early disengagement of the pin caused the R44 rattle in

28   symptomatic class vehicles. One of Honda's experts called the countermeasure changes

United States District Court
Northern District of California

8

1    "minute." Honda's documents describe the fundamental issue of early pin disengagement

2    consistently over time. Plaintiffs have shown that changes to initial interference, spring load,

3    and taper do not involve unique parts (*cf. In re Hitachi*) different materials (*cf. Grodzitsky*), or

4    otherwise materially affect the evidence needed to prove a design defect (*cf. Stockinger*)

5    (Greenstone Decl. Exh. C; Stapleford Report ¶¶ 25, 50; Arst Dep. 12–14, 67; Gibson Dep. 35;

6    Opp. Br. 9).

7         Honda urges that this order follow *Beaty v. Ford Motor Co.* and find that differing

8    manifestation rates indicate a lack of common design. 2021 WL 3109661 at *11 (W.D. Wash.

9    July 22, 2021) (Judge Thomas S. Zilly). *Beaty* reasoned that divergent warranty repair rates

10   indicated distinct auto-part designs, but Honda fails to resolve a key distinction: in *Beaty*, no

11   evidence of a common design defect appeared (Opp. Br. 9; Taylor Expert Report Fig. 5).

12   Here, plenty of evidence shows a common design defect. Differences in manifestation are not

13   enough on their own to show different design. *See Edwards,* 603 F. App'x at 540. Our single

14   merits inquiry into the R44 design will satisfy both commonality and predominance. In

15   addition, assuming that an appropriate showing is made, the jury-verdict form can subdivide

16   the class vehicles into sub-categories by countermeasure combination, which would permit a

17   jury to assess liability and damages by the various countermeasures.

18        **B.    KNOWLEDGE (CLRA, FRAUDULENT OMISSION, ILLINOIS BREACH OF
                  IMPLIED WARRANTY).**

19

20        A duty to disclose arises only if a defendant knows of a defect. *See Wilson v. Hewlett–

21   Packard Co.,* 668 F.3d 1136, 1141–43 (9th Cir. 2012). Honda contends that its knowledge

22   varied based on make, model, year, countermeasure, and changes in warranty-repair rates.

23   Thus, proof of knowledge defies common resolution, per Honda (Opp. Br. 12–13). As this

24   order has found, changes in warranty-repair rates pertain only to manifestation. Further, our

25   case differs from Honda's cited authority, *Beaty*, in at least two critical ways. 2021 WL

26   3109661 at *12. Unlike *Beaty*, this order already found that the R44 pin defect remained more

27   than "substantially similar[]" over time. *Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d

28   1103, 1105 (9th Cir. 1991). The investigation into the 2008 vehicles may therefore bear on all

United States District Court
Northern District of California

class vehicles.  Next, while common proof came from customer complaints in *Beaty*, ours appears in Honda's responses to complaints.  Our common evidence shows that the investigations continued between 2012, the first year of class vehicles, and 2016, when the R5A replacement part burst onto the scene.  One investigation ran, at the latest, August 2011 through 2016, when the R5A debuted.  Another ran August 2014 through early 2016. Associated documents dated October 2011, April 2012, October 2012, March 2014, and June 2014 all show that Honda knew about an R44 rattle, diagnosed it, and responded with countermeasures.  Differences in Honda's knowledge of the precise mechanism of the pin malfunction do not affect Honda's knowledge about premature disengagement.  While Honda "intended" for each countermeasure to permanently end the rattle, such belief would not necessarily defeat class certification.  Moreover, Honda's evidence that complaint rates plummeted, leading Honda to think that its countermeasure cured the defect, predated the class period, so would not affect the common proof of Honda's knowledge.  Finally, all relevant Technical Service Bulletins (TSBs) point the finger at a "defective" VTC Actuator.  (This order considers the TSBs for knowledge only, so does not decide whether TSBs may evince liability.  *See* Cal. Civ. Code § 1795.91) (Gibson Decl. ¶¶ 25, 26, 29; Gibson Dep. 84; Greenstone Decl. Exhs. L, N, O, R, S).

### C.   DUTY (CLRA, ICFA, FRAUD).

Safety-related defects and defects affecting a product's central functioning can both engender a duty to disclose.  *See Hodson v. Mars, Inc.*, 891 F.3d 857, 864 (9th Cir. 2018); *see also Newton v. Metro. Life Ins. Co.*, 885 F.3d 992, 1004 (7th Cir. 2018).  Honda does not contend otherwise, except in a footnote saying that a defect "must pose 'safety concerns.'" *Wilson*, 668 F.3d at 1142–43.  As stated, the 2008 study may bear on the class period and plaintiffs' showing of a potential safety hazard suffices (*see, supra,* Sections 2(A) and (B)). Furthermore, a safety hazard is subject to common proof:  the rattle put unnatural forces into the cam chain, which stretched, interfering with the locking of the teeth on the cam chain, according to plaintiffs.  True, no evidence appears that the R44 defect caused massive engine failure or any wrecks on the highway.  Such a showing is not required, however.  Plaintiffs

10

have presented some evidence to suggest that a faulty chain *could* cause engine failure. This order does not credit that theory as true, merely acknowledges that it represents the key common question, and that it remains subject to resolution in one fell swoop (Stapleford Rebuttal Rep. ¶¶ 25, 26; Taylor Rep. Fig. 5).

### D.   RELIANCE (CLRA, SECTION 17200, IMPLIED WARRANTY, FRAUD).

Under the relevant consumer protection statues and tort, materiality "is governed by an objective 'reasonable person' standard . . . ." *Edwards v. Ford Motor Co.*, 603 F. App'x 538, 541 (9th Cir. 2015). Material omissions therefore engender a "rebuttable inference of reliance as to the class." *Ibid*. In fraudulent omission suits, plaintiffs must also show that consumers would have been exposed to the disclosure. The preceding section addressed the question of materiality, *i.e.* whether a safety hazard is adequately alleged. Honda further contests exposure and reliance.

Exposure may be presumed when putative class members "interacted with and received information from sales representatives at authorized . . . dealerships prior to purchasing their" cars. *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1226 (9th Cir. 2015). In contrast, exposure has failed when not all putative representative class members allege that they interacted with or received information from a salesperson. *See Butler v. Porsche CarsN. Am., Inc.,* 2017 WL 1398316 at *10 (N.D. Cal. Apr. 19, 2017) (Judge Lucy H. Koh); *Sloan v. Gen. Motors LLC*, 2020 WL 1955643 at *44 (N.D. Cal. Apr. 23, 2020) (Judge Edward M. Chen).

Our plaintiffs all interacted with and received information from salespeople at authorized dealerships. Honda stresses that these interactions differed. Honda further stresses that plaintiffs took in and sought out information differently. *Daniel* did not reason that every class member had an identical interaction with salespersons, or that each had to subjectively rely on their advice. Such logic would not comport with the central presumption of *In re Tobacco II Cases*, 46 Cal.4th 298, 328 (2009), which permitted "a plaintiff [who] alleges exposure to a long-term advertising campaign" to state a claim. *In re Tobacco* did not even require exposure to exactly "the same" misleading advertisement by all class members; the claim simply required exposure to certain ilk of tobacco ads (Opp. Br. 17). *See ibid*. In that vein, *Daniel*

United States District Court
Northern District of California

1  held that all class members could have been "exposed" to the disclosure simply because each

2  interacted with and got information from a salesperson without regard to how heavily they

3  relied on the salesperson for information (Opp. Br. 18). *Mazza v. Am. Honda Motor Co.*, 666

4  F.3d 581, 596 (9th Cir. 2012). If Honda had a duty to disclose, a salesperson could have done

5  the job. *See Banh v. Am. Honda Motor Co., Inc.*, 2020 WL 4390371 at *17–18 (C.D. Cal. July

6  28, 2020) (Judge R. Gary Klausner); s*ee also Salas v. Toyota Motor Sales, U.S.A., Inc.*, 2019

7  WL 1940619 at *9 (C.D. Cal. Mar. 27, 2019) (Judge Fernando M. Olguin) (finding exposure

8  following *Daniel*).

9      As for the Illinois common law fraudulent omission claim, plaintiffs concede that actual

10  reliance is generally a question of fact unless materiality can be shown as a matter of law. *See*

11  *Cozzi Iron & Metal, Inc. v. U.S. Off. Equip., Inc.*, 250 F.3d 570, 576 (7th Cir. 2001). Honda

12  has failed to oppose on this point. Since plaintiffs have shown evidence of a safety hazard, this

13  claim may also certify for class-wide resolution (Br. 21; Opp. Br. 17–18).

14              *E.    MERCHANTABILITY (CALIFORNIA AND ILLINOIS).*

15      A product is unmerchantable only if "the alleged defect is substantially certain to result in

16  malfunction during the useful life of the product." *Am. Honda Motor Co. v. Superior Court*,

17  199 Cal. App. 4th 1367, 1375 (2011), citing Cal. Civ. Code § 1791.1(a) (cleaned up). Honda

18  contends that a putative automobile consumer class must show — *at class certification* — that

19  the defect will manifest within the useful life of the product. Neither our court of appeals nor

20  the California Supreme Court has squarely addressed this question.

21      District courts' Rule 23 analysis should "overlap with the merits of the plaintiffs'

22  underlying claim" only as required to ascertain a path to class-wide answers. *Wal-Mart Stores,*

23  *Inc. v. Duke*s, 564 U.S. 338, 351 (2011). Following *Dukes*, this order holds that plaintiffs need

24  not show at this stage that the class R44s are substantially certain to rattle within their useful

25  lives, only that the question is subject to common proof. Honda cites *Hicks v. Kaufman &*

26  *Broad Home Corp.*, nonbinding authority that does not offer a convincing reason why this

27  order should demand an answer on the merits now, rather than inquire whether common proof

28  will later suffice. 107 Cal. Rptr. 2d 761, 768 (Ct. App. 2001).

United States District Court
Northern District of California

1    It does not seem feasible, however, to demonstrate, class-wide, "substantial[] certain[ty]

2    [of the defect] manifest[ing] within [class vehicles'] useful lives." *Ibid*.  Common proof of the

3    defect's occurrence exists, but it pertains to in-warranty vehicles.  A jury must ponder whether

4    the rattle is "substantially likely to" manifest in a vehicle's useful lifetime, whatever the true

5    "useful lifetime" might be.  In other words, the R44s that rattle out of warranty would also bear

6    on the question of implied warranty liability.  Plaintiffs' expert opines that the R44 rattle

7    occurred, on average, at approximately 50,800 miles, but also opines that the rattle could

8    appear at almost any point in the cars' lives and that the time required to rattle "seems to vary

9    greatly."  From this, plaintiffs' expert concludes that the manifestation generally occurs within

10   the useful life.  The mileage estimate, however, refers to vehicles that manifest the rattle within

11   warranty.  Both sides' experts appear to agree that the defect will more likely develop after a

12   car emerges from warranty since early-pin disengagement represents a "durability" issue.

13   Since our warranty data, however imperfect (*see* Stapleford Rebuttal Rep. ¶ 7) represent our

14   common proof and show occurrence rates of less than 15% in putative class vehicles, plaintiffs

15   must show some evidence for years after the end of the warranty period in order to prove or

16   disprove a "substantial certainty" of manifestation.  At the same time, Honda has demonstrated

17   through warranty data that the rate of warranty repair varies by model and countermeasure, a

18   pattern likely to continue outside of warranty.  Plaintiffs have not shown that common

19   evidence can demonstrate the likelihood of a manifestation during all class vehicles' useful

20   lives (Stapleford Dep. 76–79; Greenstone Decl. Exh. Q; Stapleford Rebuttal Rep. ¶¶ 25–27,

21   30; Taylor Report Fig. 5).

22       *Keegan v. American Honda Motor Co.*, plaintiffs' authority, held simply that experts,

23   armed only with warranty data, could duel before a jury over whether a tire defect would cause

24   premature wear within a car's useful lifetime.  284 F.R.D. 504, 537 (C.D. Cal. 2012) (Judge

25   Margaret M. Morrow).  This order disagrees that experts can do so with warranty data alone.

26   Plaintiffs have fallen short of their burden to show that common proof will predominate and

27   resolve their implied warranty claims.

28

###### F.     DAMAGES MODEL (ALL).

"[A]ny model supporting a 'plaintiff's damages case must be consistent with its liability case.'"  *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 817 (9th Cir. 2019) (emphasis omitted).  Plaintiffs propose a model that tracks *Nguyen*.  Plaintiffs' damages model is amenable to resolution on a class-wide basis.  The model "computes the damages necessary to restore [c]lass [m]embers to the position they would have occupied had there been no defect (*i.e.* to give the benefit of their bargain)," as measured by "the average cost of repair."  *Id.* at 821 (Rep. Br. at 9).  This matches plaintiffs' theory of liability.  *Nguyen* squarely approved the model with respect to both the CLRA and implied warranty claims.  *Nguyen*'s logic flows to the Section 17200 (which is premised in part on CLRA), ICFA, and tort claims, as well because the benefit of the bargain method comports with the theory of fraud liability and will accurately "measure damages" needed to make the consumers whole.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 36 (2013); *see Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013).

As this order defines them, our classes of new and used purchasers do not expose Honda to double-liability.  As *Nguyen* stated, the damage is incurred at the time of sale.  The class allegations here provide that Honda overcharged at initial sale, and that Honda knew of the defect.  For those who resell back to the authorized dealer not having repaired the R44, Honda can be assumed by the same logic to know about the defect on repurchase and to discount the amount that it pays accordingly.  When Honda then resells the vehicle, it again (plaintiffs allege) will charge an inflated price, causing new injury to the purchaser of a used vehicle.  "The dealer's purchase breaks the causal chain with respect to the 'passing on' of damages."  *In re Myford Touch Consumer Litig.*, 2018 WL 3646895 at *5, n. 5 (N.D. Cal. Aug. 1, 2018) (Judge Edward M. Chen).

Those who seek a repair have already suffered the consequences of the defect and resale does not pass on the financial injury to the third party.

As for former owners who sold to third parties, plaintiffs argue, "[I]ndividuals who bought the Class Vehicles were damaged at the point of purchase when they overpaid" and

14

damage "is predicated on the number of Class Members that negotiated for a Class Vehicle with Honda and did not receive that for which they bargained" (Rep. Br. at 10). The problem is that third-party sellers may have "passed on" the overpayment, leaving the class member financially whole. *Beaty* at *13. To account for this issue of passing on the injury, our certified classes will not include any former owner who sold to a third party *unless* that former owner paid out of pocket for a repair.

*Second*, the proposed class includes purchasers who already received the R5A part. This presents no barrier because we will use Honda's records to exclude those individuals from collecting damages. *See, e.g., Sloan v. Gen. Motors LLC*, 2020 WL 1955643 at *48 (N.D. Cal. Apr. 23, 2020) (Judge Edward M. Chen).

*Third*, in a footnote, Honda contends that a small fraction of purchasers, owners of certain partial zero-emission vehicles (PZEV), "likely" remain under express warranty. Express warranty, however, only makes a purchaser whole if a rattle manifests during the warranty period and Honda fulfills the repair request. If so, Honda may later use its records to prevent any class member who collects in this suit from later demanding a warranty repair (Gibson Decl. ¶ 39; Strombom Rebuttal Rep. ¶ 44).

### 3.   TYPICALITY.

Typicality requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" FRCP 23(a)(3). This ensures "that the interest[s] of the named representative align[] with the interests of the class." *Wolin*, 617 F.3d at 1175 (cleaned up). Pellettieri is typical of the California class of new and used purchasers who did not seek repair. Quackenbush is typical of new and used the California purchaser class of individuals who paid for a repair out of pocket. Feeney is typical of the Ohio class that paid for a repair. Each belongs to her respective class. No representative plaintiff belongs to a putative class of Ohio purchasers of new and used vehicles who did not pay for repairs, so that class cannot be certified.

All named plaintiffs are typical as to the injury itself, as all have alleged and offered some evidence of a defective R44. While the proposed used-purchaser California class only

alleged violations of California Community Code § 2314, the proposed new-purchaser class alleged violations of California Civil Code §§ 1792 and 129.1 *and* § 2314. Having denied class certification on all implied warranty claims, no atypicality remains to divide a California class of used and new purchasers (Br. n. 6).

Honda argues that Pellettieri fails because her rattle stemmed from the serpentine belt. Honda has not shown this to be true. On the contrary, the video of Pellettieri's car depicts a loud rattle sounding briefly on each of the three test ignitions. Honda's expert conceded that a serpentine belt would rattle constantly, not intermittently on start-up. Facially, Pellettieri has shown evidence of a R44-defect rattle. Regardless of the true cause, however, Pellettieri's rattle appears to match other putative class members' rattles. If Pellettieri's serpentine belt actually caused the noise, then her example will provide representative evidence for the merits determination: whether the R44 defect really caused the purported symptoms class wide (*see* Pellettieri Decl. Exh. G; Arst Dep. 203; Arst Expert Rep. ¶ 42; Stapleford Rebuttal Report ¶ 35, Exh. 3).

*Second*, the statute of limitations inquiry will not defeat predominance as to the CLRA and Section 17200 claims (as Honda argues). *See Cameron v. E. M. Adams & Co.*, 547 F.2d 473, 478 (9th Cir. 1976); *cf. Holman v. Experian Info. Sols., Inc.,* 2012 WL 1496203 at *15 (N.D. Cal. 2012) (Judge Claudia Wilken). Many class members will be subject to the statute of limitations. The doctrine of fraudulent concealment, used by plaintiffs for "tolling the statute of limitations," will, in addition, involve common proof. Proof will emerge (or not) about Honda's "act of concealing [its] wrong." *Alger v. FCA US LLC*, 334 F.R.D. 415, 430 (E.D. Cal. 2020) (Judge Morrison C. England). Furthermore, our named plaintiffs include Feeney. Having purchased her car in 2019, Feeney is not subject to a statute of limitations defense. Her inclusion reassures that class representatives will vigorously prosecute the interests of absent members who remain within the statute of limitations (Opp. Br. 19–21).

*Third*, Honda claims that Feeney is atypical because she purchased the vehicle with her mother, using her mother's money. But Honda recognized her as a purchaser. Feeney chose the car with her mother, and, as pleaded, her purchase hinged on Feeney's belief about the

16

fitness of the CR-V.  Therefore, co-purchasing does not materially distinguish Feeney from other class members (Feeney Dep. 45; Greenstone Reply Decl. Exhs. Z, Y; Feeney Dep. Exh. 19).

### 4.    ADEQUACY.

Adequacy of representation occurs when plaintiffs show:  (1) that the proposed representative plaintiffs have no conflicts of interest with the proposed class, and (2) that plaintiffs are represented by qualified and competent counsel.  *See Dukes,* 509 F.3d at 1185. This order has already addressed Honda's allegation that none of the named plaintiffs suffered a stretched chain or failed engine, as the manifestation is not required for liability (Op. Br. 24). Honda further argues that the class cannot adequately represent PZEV purchasers (who may remain eligible for an in-warranty repair), due to the steep transaction costs associated with litigation.  Honda's argument fails.  The PZEV purchasers may only collect under express warranty if their R44s *remain* under warranty when their R44 actuators rattle.  This is likely to exclude many PZEV purchasers.  *In re Aqua Dots Prod. Liab. Litig*., differed.  654 F.3d 748, 752 (7th Cir. 2011).  There, a recall protected 100% of class members and so litigation costs added needless expense to the recovery effort.  *Id*. at 752.  Not so here, where it appears that few class members' R44s remain under warranty.  Likewise, *Waller v. Hewlett-Packard Co.* involved a software upgrade available to all class members, a scenario unlike ours.  295 F.R.D. 472, 488 (S.D. Cal. 2013) (Judge Larry Alan Burns).  Counsel, with Greenstone Law APC and Glancy Prongay & Murray LLP, appear experienced and competent.  The class representatives and class counsel satisfy adequacy.

### 5.    SUPERIORITY.

In opposing superiority, Honda recycles all arguments against predominance, citing "difficult of managing the litigation."  FRCP 23(b)(3)(D).  For the reasons stated, these arguments fail.  Classes, as this order has defined them, remain plaintiffs' superior vehicle for suit.

**6.    RULE 23(B)(2).**

Finding the 23(b)(3) class suitable for certification, this order **DENIES WITHOUT PREJUDICE** the alternative request for an injunction class.

**7.    MOTION TO EXCLUDE MICHAEL STAPLEFORD EXPERT TESTIMONY.**

Under Rule 702 of the Federal Rules of Evidence, an expert witness must (1) help the trier of fact; (2) utilize sufficient facts or data; (3) furnish reliable principles and methods; and (4) apply the principles and methods reliably.  Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and its progeny, the admissibility of expert testimony turns on "whether expert testimony proffered in the case is sufficiently tied to the facts of the case [such] that it will aid the jury in resolving a factual dispute."  509 U.S. 579, 591 (1993).

Honda quarrels with plaintiffs' automotive expert Michael Stapleford largely over the risks of engine damage (failure to perform deep quantitative analysis on warranty data, generalization about the data, selective evaluation of the data), and on Stapleford's use of the 2008 Honda report to evince a safety hazard class-wide.  This order rejected both arguments above.  Honda does not quarrel with Stapleford's bases for his opinion about the commonality of the design defect (Mot. to Exclude 2).

Honda also argues that Stapleford relies on evidence of damage to the five named plaintiffs' engines without ruling out other causes.  Stapleford is not required to explore every possible cause of tension-chain damage; cross examination will do that.  Honda also alleges that Stapleford conducted an unreliable inspection of the five vehicles, but his inspection of the tension chains followed National Institute for Automotive Service Excellence guidelines and used standard load and stress analysis.  It was, moreover, a joint inspection with Honda.  Plaintiffs have shown that Stapleford's opinions would aid a fact finder and lack "junk science."  *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014).

## CONCLUSION

To the extent stated, the three subclasses are **CERTIFIED** without the California and Illinois implied warranty claims.  This order **APPOINTS** class representatives Mary Quackenbush, Anne Pelletieri, and Marissa Feeney, and **APPOINTS** co-class counsel

18

Greenstone Law, APC and Glancy Prongay & Murray, LLP.  Within **14 CALENDAR DAYS**, counsel shall submit a proposed form of notice and a proposed plan of distribution that includes first class mail.  Plaintiffs shall assume the cost of notice.

**IT IS SO ORDERED.**

Dated:  December 27, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California