UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY QUACKENBUSH, GHERI SUELEN, ANNE PELLETTIERI, MARISSA FEENEY, and CARYN PRASSE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN HONDA MOTOR COMPANY, INC., and HONDA MOTOR COMPANY, LTD.<br><br>Defendants. | No. C 20-05599 WHA<br><br>**ORDER RE MOTIONS FOR RECONSIDERATION OF CLASS CERTIFICATION** |

**INTRODUCTION**

In this product-defect class action, plaintiffs and defendants independently move for reconsideration of an order on class certification. To the extent stated below, the motions for reconsideration are **GRANTED IN PART AND DENIED IN PART**.

**STATEMENT**

A previous order detailed the facts of this case (Dkt. No. 127). This action concerns vehicle owners who purchased certain Honda vehicles equipped with Variable Timing Control (VTC) actuator 14310-R44-A01 from authorized Honda dealers and now seek to recover for an alleged design defect in the VTC actuator. Plaintiffs moved for class certification. Correcting the previous statement of facts, this order clarifies that both defendants opposed. The prior order certified classes. The judge made some errors, but not as many as counsel say.

**ANALYSIS**

**1. ANNE PELLETTIERI.**

The prior order erred in treating named plaintiff Anne Pellettieri as a California purchaser instead of an Illinois purchaser. Her VTC actuator rattled but was never fixed or replaced (Amd. Compl. ¶¶ 17–21). This order now corrects the error. Plaintiff Pellettieri may represent an Illinois class of new and used purchasers, all of whom bought class vehicles from authorized Honda dealers. The class is defined below (*see, infra*, Section 6).

**2. THE PAYMENT ISSUE.**

Our order further refused to allow a class member who paid for a repair to represent class members who did not pay for repairs (Dkt. No. 127 at 6). Plaintiffs say this was clear error (Dkt. No. 157 at 1). Not so.

Plaintiffs have not provided authority requiring the district court to allow a representative who is not a member of the class to represent that class. "To have standing to sue as a class representative it is essential that a plaintiff must be a part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974) (treating class membership by a putative class representative as a standing issue); *see also E. Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 404–06 (1977) (treating class membership by a putative class representative as an adequacy issue). Courts sometimes have referred to a plaintiff's class membership as an "implicit requirement[]" of class representation. WILLIAM B. RUBENSTEIN, 1 NEWBERG ON CLASS ACTIONS §§ 3:8–3:10 (5th ed. database updated Dec. 2021).

Plaintiffs want plaintiff Mary Quackenbush, who purchased her vehicle from an authorized Honda dealer in California and who paid for a replacement VTC actuator, to represent California claimants who did *not* obtain or pay for a replacement or repair (Amd. Compl. ¶¶ 11–13). They argue that *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168 (9th Cir. 2010), and *Nguyen v. Nissan North America, Incorporated*, 932 F.3d 811 (9th Cir. 2019), provide that plaintiff Quackenbush shares a legal injury with California class

members who did not pay for a repair.  True, *Wolin*'s class representative paid for part of the repair but represented consumers who did not.  *See* 617 F.3d at 1171; *see also Gable v. Land Rover N. Am., Inc.*, 2011 WL 3563097, at *1 (C.D. Cal. July 25, 2011) (Judge Andrew J. Guilford).  This order accepts plaintiffs' contention, based on *Wolin* and plaintiffs' other cited decisions, that courts regularly appoint class representatives who paid for repairs to represent class members who did not, and vice versa (Dkt. No. 157 at 2–3).  Nevertheless, this order finds no error in the December 27 determination that a member of one class should not represent a different class.

Plaintiff Quackenbush is inadequate to represent class members who did not obtain or pay for a VTC actuator repair.  *Amchem Products, Incorporated v. Windsor* is instructive.  521 U.S. 591 (1997).  That decision found class members who were "currently injured" with mesothelioma inadequate to represent those who had merely been exposed to asbestos.  *Id*. at 626.  The interests of those already suffering from mesothelioma "tug[ged] against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future."  *Ibid*.  *Amchem*'s inter-plaintiff conflict of interest bears a meaningful similarity to our facts.  Here, class members like plaintiff Quackenbush have already sunk their own funds into repairs.  They have an incentive to recoup their actual reimbursement as soon as possible.  In contrast, those class members who either heard no rattle, who heard it but felt no concern, or who heard it but did not feel *enough* concern to pay for a repair themselves, likely feel less urgency to resolve quickly and also have a greater incentive to fight for maximum potential recovery, since replacement cost and defect valuation remain unknown.  Plaintiff Quackenbush's circumstances thus materially differ from those of purchasers who did not pay for repairs.  This order disagrees with plaintiffs' contention that plaintiff Quackenbush could belong to "both classes" (Dkt. No. 157 at 1).

Plaintiff Quackenbush is not adequate to represent a new and used California class of individuals who bought class vehicles from authorized Honda dealers but who did not obtain or pay for a repair.  Reconsideration on this point is **DENIED**.

3

1   This order therefore does not reach defendants' argument regarding excluding partial
2   zero-emission vehicle purchasers from a California new and used class.

###   3.   CLARIFICATION ABOUT REPLACEMENT PARTS.

This order now clarifies, at defendants' request, that any class member who received a free replacement part has suffered no injury and is not a class member. *See TransUnion LLC v. Ramirez*, 594 U.S. ___, 141 S. Ct. 2190, 2208–13 (2021). Plaintiffs respond only to note that such clarification is unnecessary. The need to determine these class members' identities, however, will not preclude class certification. Honda repair records will facilitate the sorting.

###   4.   ILLINOIS IMPLIED WARRANTY OF MERCHANTABILITY CLAIMS.

Plaintiffs contend that our prior order erred in refusing to certify Illinois implied warranty of merchantability claims for class treatment because it failed to consider plaintiffs' cited Illinois authority. This order disagrees.

Plaintiffs argue that the authority they cited demonstrate that Illinois implied warranty claims do not require a showing that a vehicle design defect is substantially certain to manifest within the useful life of the vehicle. In their initial motion for class certification, plaintiffs cited *Check v. Clifford Chrysler-Plymouth of Buffalo Grove, Incorporated*, which defined the standard for an Illinois implied warranty claim: a vehicle must be fit "for the ordinary purpose of driving," which means "that the vehicle should be in a safe condition and substantially free of defects." 342 Ill. App. 3d 150, 159 (2003) (cleaned up) (*see* Dkt. No. 69 at n.6). *Check* ruled on post-trial motions. That court did not face the question of whether manifestation of a defect must be substantially certain to occur within a car's useful life. *Check* cited the Illinois Commercial Code in relevant part, which states no requirement for substantial certainty of manifestation within a car's useful life. ("Goods to be merchantable must be at least such as . . . . pass without objection in the trade under the contract description; and . . . are fit for the ordinary purposes for which such goods are used . . . ." 810 ILCS 5/2–314(1), (2)(a), (2)(c).) The other decision that plaintiffs plausibly cited in their opening brief for the Illinois implied warranty of merchantability standard regarding manifestation, *In re FCA US LLC Monostable Electronic Gearshift Litigation*, likewise did not address the present question. 334 F.R.D. 96,

4

1    112 (E.D. Mich. 2019) (certifying for class treatment the issue of safety defect, with respect to Illinois implied warranty of merchantability claims). In that decision, class vehicles' defects had largely already manifested. *Id*. at 113 ("[S]tudies performed by the defendant . . . suggest[ed] than an overwhelming majority" of class vehicles malfunctioned such that their drivers could not "reliably select intended gear settings.").

When opposing class certification, defendants, in contrast, requested that the prior order follow *Hicks v. Kaufman & Broad Home Corporation* with respect to all claims for implied warranty of merchantability. 89 Cal. App. 4th 908, 910 (Cal. Ct. App. 2001). That California decision required the plaintiff to show, for an implied warranty of merchantability claim, that the "inherent defect" was "substantially certain to result in malfunction *during the useful life of the*" product. *Id*. at 918 (emphasis added). Plaintiffs opposed *Hicks*' applicability to our Illinois claims in a terse footnote, which cited no legal authority (Dkt. No. 100 at n.1). The prior order agreed, in part, with defendants. It relied upon *American Honda Motor Company v. Superior Court*, which cited and reiterated *Hicks*' requirement (proof that a defect would be substantially certain to manifest within the useful life of the vehicle) as to the California implied warranty of merchantability claims. 199 Cal. App. 4th 1367, 1375 (2011). The prior order also applied the reasoning underlying *Hicks* and *American Honda Motor Company* — *i.e.*, that implied warranties of merchantability extend only for the duration of a product's useful lifespan — to the Illinois implied warranty of merchantability claims. To repeat, *Check* did not address the issue for which defendants cited *Hicks*. Finding that plaintiffs had not demonstrated the existence of some class-wide proof that the defect was substantially certain to manifest within class vehicles' useful lives, the prior order herein proceeded to deny class certification as to both states' implied warranty of merchantability claims.

This order rejects plaintiffs' argument that defendants conceded this point by failing to oppose plaintiffs' recitation of the Illinois standard for implied warranty of merchantability or by failing to supply Illinois authority stating a holding matching *Hicks* (Dkt. No. 157 at 4). This order does not consider defendants to have conceded. Defendants continued to maintain,

citing persuasive authority, that the Illinois implied warranty claims require showing substantial likelihood that the defect would manifest within the cars' useful lives.

Plaintiffs now also ask that this order follow *Flynn v. FCA US LLC* for the Illinois claims. 327 F.R.D. 206 (S.D. Ill. 2018). Plaintiffs cited *Flynn* in initial briefing for a different topic within implied warranty (privity). It is doubtful that plaintiffs raised *Flynn* with respect to the manifestation issue (Dkt. No. 68 at n.7). Regardless, *Flynn* is not dispositive.

The *Flynn* plaintiffs alleged that a software defect left their cars vulnerable to hacking. The defendants moved for summary judgment. *Flynn* denied the defendants' motion as to implied warranty of merchantability. *Id.* at 216–17. The *Flynn* defendants argued that the plaintiffs had not been "hacked *before bringing suit*," and that the plaintiffs were required to show hacking in order to prevail on implied warranty of merchantability. *Id*. at 217 (emphasis added). *Flynn* disagreed, finding a genuine dispute of material fact as to whether the alleged defect was "in the design and the installation . . . at the time" the cars "were sold." *Ibid*. The question presented in *Flynn* was not the same as the question of whether plaintiffs must prove that the defect was substantially certain to cause malfunction within the class vehicles' useful lives. Defendants here further contended in initial briefing on class certification that there was no common proof for or against this proposition. The prior order agreed. Furthermore, defendants' argument herein differed from that of the *Flynn* defendants because a third-party must take initiative to hack into a software system. Refusing to require the *Flynn* plaintiffs to show that they *had been* hacked by a third party thus qualitatively differs from the issue of malfunction within a vehicle's useful life. Since *Flynn* held simply that the plaintiffs did not need to show that their cars had already been hacked, and since neither *Check* nor *In re FCA* faced similar questions, citing these decisions did not present a dispositive legal argument.

Plaintiffs have not shown "[a] manifest failure by the Court to consider material facts or dispositive legal arguments which were presented." Civ. L.R. 7-9(b)(3). Reconsideration of this issue is **DENIED**.

### 5. HONDA'S KNOWLEDGE OF SAFETY-RELATED DEFECT.

To certify plaintiffs' claims for class treatment, plaintiffs must demonstrate common proof exists for a fact-finder to decide Honda's knowledge about the alleged safety-related defect. *See Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1142–43 (9th Cir. 2012). Defendants move for reconsideration of our finding of common proof with respect to such knowledge. Defendants argue our prior order committed clear, material error regarding the end date of the 2011 Honda study into the VTC actuator rattle, which was titled "Cam Chain Tensioner Failure." Defendants are correct as to the date error. The order erred in stating that Honda's study into the VTC rattle was ongoing between 2010 and 2014 (Dkt. No. 127 at 8). The study actually began in October 2010 and ended in April 2011 (Dkt. No. 67-19 at H-Q 018869). The study nonetheless provides common evidence of Honda's pre-class period knowledge of a safety issue. Here is why.

Our order dated December 27 described, in part, plaintiff's theory of the safety hazard as including a stretched cam chain. The prior order also found the study provides common evidence of a safety hazard. Defendants now object that the 2011 study did not find a stretched cam chain. Defendants are correct on this point, but the study did find damage to the cam chain tensioner teeth. The order should have explained more clearly that the defect's safety hazards included damaging the tensioner teeth, which damage could cause the engine to stop working properly. Still, the finding of damaged tensioner teeth provides common proof of Honda's knowledge that the defect concerned safety. Furthermore, common evidence of Honda's knowledge also flows from a limited number of Honda repairs, which found both stretched cam chains and damaged tensioners, as well as from Quality Improvement Sheets (QISs) that initiated further investigations into the rattle before and during the class period.

A 2011 Honda QIS described the mechanism of the VTC rattle (Dkt. No. 67-19 at H-Q 018870):
> As the VTC hammers back & forth, the timing chain begins to slap. The tensioner receives the force against the plunger and pushes back against the tensioner cam. Repeated hammering causes the cam & plunger teeth to wear. Once the teeth become worn, the tensioner locking capability is lost. This allows the plunger to move freely & the timing chain to slap.

7

The 2011 study consisted of three separate tests, a summary of which defendants produced to plaintiffs in discovery. The Honda study summary also referenced, but did not link to or append, videos of the three tests (Dkt. No. 67-20 at H-Q 061503, 061505, 061507, 061509).

In Test 1, Honda modified the locking pin to recreate the VTC actuator rattle, drained the VTC actuator of oil, and blocked oil from flowing back into the actuator, but allowed oil to flow freely to the tensioner (*id*. at H-Q 061502–04). The purpose was to determine if the "N/G [no-good]" VTC was "the single cause of the defective tensioners" (*id*. at H-Q 061510). Investigators started the engine 512 times (*id*. at H-Q 061503). Test 1 found no cam chain or cam chain tensioner damage (*id*. at H-Q 061510).

In Test 2, Honda used the same defective actuator. Investigators again drained the oil and blocked oil flow to the VTC actuator. They further blocked oil flow to the tensioner. The Honda study summary noted that the test would "truly represent[] initial start conditions" and that the "condition exists if the vehicle set for >15 minutes." The test found damage to the tensioner teeth in "only" 150 starts (*id*. at H-Q 061510).

Test 3 used a functional VTC actuator as a control. Testers blocked the oil supply to the tensioner and found no damage after 500 starts (*id*. at H-Q 061509–10).

Plaintiffs' theory of the safety hazard includes at least two possibilities: that the VTC rattle stretched the cam chain and that it damaged the cam chain tensioner teeth. Either problem could cause the engine to skip time, plaintiffs contend. Honda's expert Jason Arst conceded that a hypothetical worn tensioner would worsen the deterioration of other parts: "If you wear" the tensioner teeth "down, you're going to cause accelerated failure of parts, absolutely" (Dkt. No. 101-2, Arst Dep. 164–66). Expert Arst additionally stated that tensioner damage could ultimately lead to engine components losing synchronicity, which in turn could cause an engine to "jump[] time" (*id*. at 165). That is, "the sprocket and chain relationship is no longer the way you want it or the way it should be. So you get sort of an out of alignment between where the two items are supposed to be . . . . And so therefore your timing is going to be different than the way it should be" (*id*. at 164–65). Expert Arst added, "If you jump one tooth, it's just not going to run and perform as intended. So I don't think that's unsafe" (*id*. at

8

165). But "[a]t some point, you're going to — if you keep jumping time and keep jumping time, then you could get into a situation where you have interference between parts. And then the engine would stop running at that point," which "may be" a safety problem (*id*. at 165–66). The 2011 study showed tensioner damage under conditions intended to model the real world. Expert Arst's explanation demonstrates that the study offers some proof of Honda's knowledge that a damaged tensioner posed the alleged safety hazard and also a threat of damage to other parts, such as the cam chain.

Defendants maintain that Test 2 represented "an artificial laboratory condition," from which a jury cannot generalize. In reality, they say, oil always flowed into the actuator and tensioner after a few seconds, halting the rattle. They ask this order to accept Test 1 as the real-life analogue and hold that the rattle "alone" does not damage the tensioner (*see, e.g.*, Dkt. No. 156 at 7).

True, Honda appears to have designed Tests 1 and 3 to identify whether the VTC rattle *alone* was causing damage to the tensioner teeth. As to Test 3, however, the Honda study summary stated: "If tensioner teeth are **not** damage [sic] then the N/G [no good] VTC is creating the damaged tensioners" (Dkt. No. 67-20 at H-Q 061501 (emphasis in the original)). Test 3 found no damage using a functional actuator. It therefore appears Honda believed at the time that without a faulty VTC no damage would occur.

The 2011 study moreover designed Test 2 "*to more closely represent start up 1st thing in the morning (or after delays greater than 15 minutes drain time)*." It also sought to account for the fact that "[o]il flow to the tensioner can be reduced by poor maintenance and *very low oil conditions*" (Dkt. No. 67-20 at H-Q 061504 (emphasis added); *see also id*. at H-Q 061510). By accounting for drained/low oil conditions, the study acknowledged that those conditions better represented real-life conditions. Defendants' objections go to weight.

Defendants raise additional points, but none convince. Defendants ask that this order reject Test 2. They imply that by blocking oil flow, Honda allowed the VTC actuator to hammer for more than "one to three seconds" during Test 2, rendering it unlike real life (Dkt. No. 156 at 7). Defendants could have submitted the videos referenced in the Honda study

9

summary to show the duration of the Test 2 rattle, but they did not. In any case, the Honda study summary appears to show that Honda believed, at the time, in Test 2's relevance. Honda's belief then is what matters. Defendants next object that plaintiffs conflate evidence of the alleged defect with evidence of knowledge about the defect's relationship to safety. But this order concludes that Honda had access at all material times to its own 2011 study, which examined the defect and found safety-related issues. In addition, defendants object that the 2011 study ultimately took "no action," which they argue shows that Honda was not aware of a safety defect (*id*. at 5–6). As defendants acknowledge, by the time the 2011 study ended, Honda had already implemented a prospective countermeasure (*id*. at n.5). The statement "no action," appeared in a Honda QIS discussing the 2011 study conclusions, beneath the header for "Recommended Field Action" (Dkt. No. 67-19 at H-Q 018871). The QIS mentioned improved warranty-repair rates in actuators with the new countermeasure. Taking "no action" could suggest that Honda felt at that time that the countermeasure was effective enough not to recommend additional solutions, but the 2011 study nevertheless offers common evidence that Honda knew of the safety defect. As the prior order held, the defect remained the same during the class period, making the 2011 study applicable to all class vehicles (Dkt. No. 127 at 8–9). Furthermore, additional QISs active before and during the class period indicate that Honda knew of a continuing problem with the rattle, albeit with varying degrees of frequency. Again, defendants' objections go to weight.

A jury could also consider the sixty-five class-vehicle repair requests as common proof of Honda's knowledge about the alleged safety-related defect (Dkt. No. 67-27 at Exh. E). Those undated repair summaries note, to varying extents, VTC actuator rattling (aka, "grind[ing]" and "noise"), as well as stretched cam chains and damaged tensioners. Defendants object that these records at best show correlation not causation between the VTC actuators and parts degrading, a result explainable by the age of the parts (Dkt. No. 159 at 5). True, standing alone, the repair records from class vehicles would offer weak evidence of knowledge. Likewise, three other QISs that initiated investigations into the rattle, standing alone, might not have evinced Honda's knowledge of safety-related defect (March 2008–

10

November 2009; August 2011–August 2014; and January 2014–September 2017) (*see* Dkt. Nos. 67-12, 67-14, 67-16). Given, however, that the 2011 study revealed to Honda that the defect could pose a safety risk, the damaged engines and/or QISs supply some further evidence that the company knew the VTC actuator defect concerned safety.

In addition, defendants object that "as a matter of law," the sixty-five repairs were too few to evince Honda's knowledge of the safety hazard (Dkt. No. 159 at 5). They cite *American Suzuki Motor Corporation v. Superior Court*, which concerned implied warranty of merchantability claims related to a design flaw that manifested, *i.e.*, led to roll-over accidents, in only a "small percentage" of putative class vehicles. 37 Cal. App. 4th 1291, 1298 (1995). The *Suzuki* decision held that the risk of roll-over accident was too "speculative" to show the vehicles did not perform as promised and consequently held that no ascertainable class existed. *Id*. at 1297, 1298. Our prior order rejected the argument that plaintiffs must show manifestation of a defect to certify a class as to any claims other than the implied warranty claims (Dkt. No. 127 at 10–11, 12). The issue is not up for reconsideration. But even if this order were to apply *Suzuki*'s reasoning to the issue of common evidence of a *safety hazard* (rather than manifestation of a defect, as in *Suzuki*), the sixty-five Honda repairs that plaintiffs present would not provide the relevant figure. The sixty-five records represented a number of vehicles known to Honda to have damaged engine part(s) in connection with a "no-good" VTC actuator. As stated, the 2011 study drew the connection between the "no-good" VTC actuators and damaged cam chain tensioner teeth in class vehicles. Expert Arst then connected the damaged tensioners to a greater risk of damage to other engine parts (*e.g.*, the cam chain) and to the possibility of an engine "skipping time." This order credits a lack of synchronicity between engine parts as posing a potential safety problem. The risk was that parts could interfere with one another, disrupting the motive power of the engine. Thus, the vehicles that manifested the defect as a rattle (grinding, etc.) represent the relevant number of cars. That is, those cars that manifested some signs of the VTC defect could have made Honda aware of a safety-related defect. Honda's expert, Paul M. Taylor, calculated the class-vehicle repair percentages as ranging, by model, state, countermeasure, and other variables, from less-than

11

one percent up to approximately fourteen percent, *i.e.*, far more than sixty-five (*see* Dkt. No. 82-6 at Figs. 3, 5–9). Plaintiffs contend that the number should be higher still (*see* Dkt. No. 100 at 6–7). In short, the 2011 study provides common evidence to suggest that Honda knew that the defect concerned safety, and the sixty-five cars with damaged parts as well as QISs offer some confirmation thereof.

Having considered both sides' briefing on this issue, this order finds our record contains common evidence going to Honda's knowledge of a safety defect. Therefore, common evidence will facilitate a determination about whether Honda had a duty to disclose the alleged defect when it sold class vehicles. The December 27 order did not manifestly err on these points. Reconsideration is **DENIED**.

### 6. CLASS DEFINITIONS.

Defendants further request that we exclude, for clarity, any purchaser who paid for a repair and belongs to a "repair" class (defined below), from any "new and used" class. This comports with the prior order's intention to avoid dual class membership or double recovery. This request is **GRANTED**. For clarity, all class members must have purchased their class vehicle from an *authorized* Honda dealer. This order also **GRANTS** plaintiffs' request to exclude certain exempt individuals, such as persons who suffered personal injuries flowing from these facts. Incorporating the changes described herein and certain clarifications and exclusions requested, the following classes are now **CERTIFIED**:

> **California Repair Class:** All persons who purchased a new or used Class Vehicle equipped with VTC Actuator 14310-R44-A01 from an authorized Honda dealer in California, and who paid to have their VTC Actuator repaired by an authorized Honda dealer in California. Mary Quackenbush will represent this Class.
>
> **Illinois Repair Class:** All persons who purchased a new or used Class Vehicle equipped with VTC Actuator 14310-R44-A01 from an authorized Honda dealer in Illinois, and who paid to have their VTC Actuator repaired by an authorized Honda dealer in Illinois. Marissa Feeney will represent this Class.
>
> **Illinois New and Used Purchaser Class:** Current owners of both new and used Class Vehicles who purchased their Class Vehicles equipped with VTC Actuator 14310-R44-A01 from an authorized

> Honda dealer in Illinois and former owners of the same who resold (or traded it in) to an authorized Honda dealer in Illinois. No member of a repair class shall be a member of this Class. This Class also excludes any purchaser who has received an R5A replacement actuator free of charge. Anne Pellettieri will represent this Class

(*see* Amd. Compl. ¶¶ 11–13, 17–20, 23–25). Excluded from the classes are: (1) defendants, any entity or division in which defendants have a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the judge to whom this case is assigned and the judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein (*id*. ¶ 70).

## CONCLUSION

Within **14 CALENDAR DAYS**, counsel shall submit a proposed form of notice and a proposed plan of distribution that includes first-class mail. Plaintiffs shall assume the cost of notice.

**IT IS SO ORDERED.**

Dated: April 27, 2022.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE